## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

STEFFAN HOBBS, by and through his
parents and next friends, JIMMY and
JANET HOBBS,

       Plaintiff,

vs.                                                              No.  06-CIV-0985 BB/WDS

MARSHA ZENDERMAN, JOEY KELLENAERS,
and PAMELA HYDE, Secretary of the Department
of Human Services, in their individual and official
capacities,

       Defendants.

## OPINION

THIS MATTER comes before the Court for consideration of the following motions: (1)

several motions to strike evidence, filed by both Plaintiff and Defendants (Docs. 23, 56, 132, and

144); (2) two motions for summary judgment filed by Defendants (Docs. 18, 74); (3) two

motions for partial summary judgment filed by Plaintiff (Docs. 102, 121); (4) a motion to amend

the complaint and a supplement to that motion, filed by Plaintiff (Docs. 85, 157); and (5) a

motion in limine filed by Defendants (Doc. 171).  The Court has reviewed the motions, the

responses thereto, and the materials submitted by the parties, and will dispose of each motion as

discussed below.

### Brief Summary of Facts

This is a 42 U.S.C. § 1983 case, brought by Plaintiff after he lost his eligibility for

Medicaid benefits provided by the State of New Mexico.  Plaintiff is a minor child and had been

receiving such benefits as a result of a head injury suffered in an accident.  At some point after

the injury, Plaintiff settled legal claims arising out of the accident and received a settlement of

$2,500,000 from a third party.  [Doc. 102, Exh. 2]  After payment of attorney fees, medical

expenses, costs, and individual recoveries for Plaintiff's parents, Plaintiff was left with

$1,100,000 in settlement proceeds.  [*Id.*]  In order to maintain Plaintiff's eligibility for Medicaid

benefits, the state court that approved the settlement also approved the creation of what is called

a special-needs trust.[1]  The state court directed that $750,000 of Plaintiff's proceeds be used to

purchase an annuity, with the annuity payments to be made to the trust, and that the remainder of

the proceeds also be placed in the trust.  At some point thereafter, Defendants[2] became concerned

about certain expenditures made from trust funds.  These expenditures included the following:

(a) payment of a substantial portion of the cost of the family home, land surrounding the home,

and improvements to the home; (b) the cost of furnishings for the home; (c) payment of the

homeowners' insurance premiums; (d) the cost of farm animals, equipment, and supplies; and (e)

payment of a net monthly salary to Plaintiff's mother of $2200 per month, for acting as Plaintiff's

caretaker.[3]  Defendants believed these expenditures had not been made, or were not being made,

---

[1]A special-needs trust, also known as a supplemental-needs trust,  is a trust created on behalf of a disabled individual under the age of 65, in order to allow the individual to retain eligibility for Medicaid while also having special or supplemental needs, not covered by Medicaid, paid for out of trust funds.  *See, e.g., Hecht v. Barnhart*, 217 F.Supp.2d 356, 363 (E.D.N.Y. 2002).  Use of such a trust is specifically authorized by a federal statute, 42 U.S.C. § 1396p(d)(4)(A).  One requirement of a special-needs trust is a clause providing for reimbursement to the state, upon the termination of the trust, for all monies spent by the state to pay for the beneficiary's medical care.  § 1396p(d)(4)(A).

[2]For ease of reference, this opinion refers to Defendants in the aggregate, except where actions of a particular Defendant must be addressed.  The term "Defendants" will also apply to the state agency for which Defendants worked.

[3]It is not clear what the trust paid to Plaintiff's mother as gross salary per month; it is clear, however, that after withholding amounts for social security and taxes, the net salary was

for the sole benefit of Plaintiff.  As a result, Defendants decided the trust would have to be

considered a resource available to Plaintiff, and informed Plaintiff's parents that Plaintiff would

no longer be eligible for Medicaid.[4]  An exchange of communications then ensued between

Defendants and counsel for Plaintiff.  During the course of these communications, Defendants

made several requests or demands for changes in Plaintiff's trust or in the expenditures being

allowed from the trust.  Later, Defendants dropped many of those requests or demands.  In the

end, however, the parties could not reach an agreement, and Defendants issued a decision

terminating Plaintiff's Medicaid benefits and eligibility.

Plaintiff appealed this administrative decision and was afforded an evidentiary hearing in

which he was allowed to challenge the factual and legal basis for the decision.  The parties

submitted documentary evidence, testimony, and legal argument to the administrative law judge

("ALJ").  Following the hearing, the ALJ issued a recommended decision affirming the

termination of Plaintiff's Medicaid benefits; this recommended decision was adopted as the final

decision of the State administrative agency.  Plaintiff then filed a state-court appeal of this

administrative decision.  Instead of pursuing that appeal, however, Plaintiff also filed this

federal-court lawsuit under § 1983.  Plaintiff then requested that the state district court issue a

stay of the case pending before it, to allow Plaintiff to pursue the federal-court case to resolution.

The state district court granted the stay, leaving the case before this Court as the only currently

active case challenging the termination of Plaintiff's Medicaid benefits.  The most significant

---

$2200 per month at the time of the hearing held on Plaintiff's motion for a preliminary
injunction.

[4]A recipient of Medicaid may not own resources worth more than $2000, with certain
exceptions that are not pertinent to this case.

legal issue in the case appears to be an issue of first impression.  That issue is the question of whether, when a special-needs trust exists and Medicaid eligibility is at stake, a state may examine the manner in which trust funds are being spent to determine whether the trust is being administered for the sole benefit of the Medicaid recipient/trust beneficiary.  Plaintiff contends a state has no right to do so, and must rely solely on the trustee to make decisions that are in the best interest of the beneficiary.   As noted above, the parties have filed a number of different motions in this case, which the Court now addresses.

**Motions to Strike Evidence**

The parties have filed motions to strike portions of affidavits submitted by the opposing side in connection with the various motions for summary judgment that have been filed.  These motions to strike are based on claims that the affidavits contain hearsay, inadmissible legal opinions, evidence concerning settlement negotiations, and speculation not based on personal knowledge.  Unfortunately, the motions do little more than add to the already-heavy workload of the parties and this Court.  Each motion required the filing of a response and often a reply, and required this Court to examine the pleadings to determine the merits of the parties' arguments.  It would have been far more efficient for the parties, and certainly for the Court, if the admissibility issues had simply been argued in the summary-judgment briefs submitted by the parties.  For example, the Court is well aware that in addressing motions for summary judgment, the Court may consider only evidence that in substance would be admissible at trial, and motions on that theme are fruitless.  The Court will therefore deny all of the motions to strike as unnecessary, and will decide what evidence is admissible in the course of addressing each motion for summary judgment.

**Defendants' Second Motion for Summary Judgment, Based on Collateral Estoppel**

Defendants argue that the doctrine of issue preclusion, also known as collateral estoppel, prevents Plaintiff from re-litigating in this Court any of the issues that were litigated and decided during the administrative proceedings held following Plaintiff's appeal of the termination of his Medicaid benefits.   Defendants maintain Plaintiff is bound by the factual and legal determinations made during those administrative proceedings, and accordingly cannot satisfy the elements of any of his claims.   In response, Plaintiff's chief contention is that collateral estoppel applies only to administrative decisions that have become final.   Plaintiff points out that the administrative decision made in his case has been appealed to the state district court, and argues the decision is therefore not a final decision for collateral-estoppel purposes.   Applying New Mexico law,[5] the Court disagrees with Plaintiff's argument.   However, for the reasons discussed below, the Court also disagrees with Defendants' argument that every decision made during the administrative proceedings gives rise to collateral estoppel in this case.

In New Mexico, administrative decisions are given collateral estoppel effect if they were "rendered under conditions in which the parties have the opportunity to fully and fairly litigate the issue at the administrative hearing."   *Shovelin v. Central New Mexico Elec. Co-op., Inc.*, 850 P.2d 996, 1001 (N.M. 1993).   Plaintiff does not contend the administrative hearing held in this case deprived him of such an opportunity, and such a contention could not succeed in any event. Plaintiff was allowed to present evidence and advance legal arguments concerning all aspects of

---

[5]In determining what collateral-estoppel effect should be given to the administrative proceedings, this Court is required to afford those proceedings preclusive effect to the same extent they would have such effect in New Mexico state courts.   *See, e.g., Brockman v. Wyoming Dep't of Family Servs.*, 342 F.3d 1159, 1165 (10th Cir. 2004).

his Medicaid benefits, including the expenditures from the special-needs trust and the issue of whether the State was authorized to question such expenditures.  The administrative hearing was a formal, quasi-judicial proceeding, with both sides represented by counsel.  *See Southworth v. Santa Fe Services, Inc.*, 963 P.2d 566, 569 (N.M.App. 1998) (preclusion doctrines do not apply to findings of an administrative body unless the body was acting in a quasi-judicial capacity).  The Court therefore addresses only Plaintiff's argument that the administrative decision is not a final decision and for that reason is not entitled to preclusive effect.

"It is well established that the doctrines of res judicata and collateral estoppel apply only to final judgments."  *C & H Const. & Paving Co., Inc. v. Citizens Bank*, 597 P.2d 1190, (N.M.App. 1979).  Plaintiff argues that, because he appealed the adverse administrative decision and that appeal is still pending, the decision cannot be considered final.  However, Plaintiff elected to stay his appeal rather than pursue it at the state district court level.  By doing so, Plaintiff in effect chose to forego the appeal, at least for purposes of the collateral-estoppel doctrine.  Any other result would be contrary to the principles of fairness and judicial economy underlying the collateral-estoppel doctrine.  Accepting Plaintiff's argument would mean Plaintiff would be allowed to fully but unsuccessfully litigate his entitlement to Medicaid benefits at a formal administrative hearing, then obtain another full evidentiary trial in this Court by the simple expedient of postponing consideration of his state-court appeal of the administrative decision.  To avoid this unacceptable result, the Court will treat this as a case in which the losing party at the administrative level has decided not to appeal the decision further.  When that is the case, the administrative decision is considered final and is entitled to preclusive effect.  *See, e.g., Brockman v. Wyoming Dep't of Family Servs.*, *supra,* 342 F.3d at 1166-67 (administrative decision had

6

attained finality, and gave rise to collateral estoppel, where losing party did not pursue her appeal to district court); *Olson v. Morris*, 188 F.3d 1083, 1086 (9th Cir. 1999) (under Arizona law, failure to appeal a final administrative decision makes that decision final for res-judicata purposes); *see generally Angel v. Bullington*, 330 U.S. 183, 189-90 (1947) (litigant who has a right to appeal, but fails to do so, is in same position for preclusion purposes as one who has appealed and lost).  The Court therefore cannot accept Plaintiff's argument that the administrative decision has no collateral-estoppel effect in this case.

As noted above, however, the above determination is not the end of the matter.  If the issue decided in an earlier proceeding is a pure issue of law, application of the collateral-estoppel or issue-preclusion doctrine is not required.  *See Environmental Defense v. U.S. E.P.A.*, 369 F.3d 193, 203 (2d Cir. 2004); *Boomer v. AT&T Corp.*, 309 F.3d 404, 422 n. 10 (7th Cir. 2002).  This is especially true when the issue involves a question of statutory construction, and is therefore an issue of general interest.  *See Seneca Nation of Indians v. State of New York,* 26 F.Supp.2d 555, 569 (W.D.N.Y. 1998) ("[C]ollateral estoppel is less favored when the issue to be precluded is a legal one, and least favored when it is one of statutory construction..."); *Boomer, supra* (collateral estoppel need not be applied when the issue is a pure issue of law, is of general interest, and has not been resolved by the highest appellate court that can resolve it).

The key question in this case is whether a state has the authority to assess the administration of a special-needs trust in determining Medicaid eligibility of the trust beneficiary -- that is, whether a state can determine that a trust is not being administered for the sole benefit of the disabled beneficiary, and can deny Medicaid benefits on that basis.  This is a pure question of law requiring construction of the federal Medicaid statute.  For that reason, the Court will not

7

accord collateral-estoppel effect to the administrative decision in this case, to the extent that decision affirmed Defendants' authority to undertake an inquiry into the administration of Plaintiff's special-needs trust.  Instead, Defendants' motion for summary judgment based on the collateral-estoppel doctrine will be denied, and the Court will perform its own analysis of the pure issues of law raised by this case.[6]

### Defendants' and Plaintiff's Cross-Motions for Summary Judgment on the Merits

Plaintiff's complaint raises constitutional claims as well as statutory claims; Plaintiff contends in essence that Defendants violated his right to due process by the manner in which his Medicaid benefits were terminated, and violated the applicable statute by erroneously terminating his benefits.  For purposes of this opinion, the Court will assume Plaintiff may use § 1983 to challenge the alleged violation of the Medicaid Act, as well as the claimed constitutional violations.  *See, e.g., Watson v. Weeks*, 436 F.3d 1152, 1159-60 (9th Cir. 2006) (private right of action exists under § 1983 to redress at least some violations of the Medicaid Act); *cf. Oklahoma Chapter of the American Academy of Pediatrics v. Fogarty*, 472 F.3d 1208, 1212 n. 1 (10th Cir. 2007) (declining to decide the issue, but assuming such a right of action does exist).  Both sides have filed motions for summary judgment addressing the central issue in this case, as well as raising other arguments such as qualified immunity.  As discussed below, the central issue appears to be dispositive of all claims and issues in this case.

The legal question presented is the proper construction of the following statutory language:  "This subsection [restricting ability to shelter resources in a trust] shall not apply to any

---

[6]Plaintiff will not, however, be allowed to re-litigate any issues of fact decided during the administrative proceedings, and will be bound by the factual findings contained in the administrative decision.

of the following trusts: ... [a] trust containing the assets of an individual under age 65 who is disabled ... and which is established for the benefit of such individual by a parent, grandparent, legal guardian of the individual, or a court if the State will receive all amounts remaining in the trust upon the death of such individual up to an amount equal to the total medical assistance paid on behalf of the individual under a State plan under this subchapter." 42 U.S.C. § 1396p(d)(4)(A). According to Plaintiff, this statute has the following, and only the following, requirements: (1) that the trust beneficiary is disabled and under the age of 65; (2) that the trust was created for the benefit of that disabled person by his or her parent, grandparent, or legal guardian, or by a court; and (3) that the trust provides that upon the death of the beneficiary, the state that has paid for the beneficiary's medical expenses through the Medicaid program will be reimbursed for all of those payments, before any money remaining in the trust is distributed to any other entity (in other words, the trust must create a remainder interest in the state, for full reimbursement of all amounts paid for the beneficiary's medical care). Once the trust is created and satisfies these requirements, Plaintiff argues, the manner in which the trust is administered is of no concern to the state and is irrelevant to the beneficiary's eligibility for Medicaid.

Defendants, on the other hand, contend the purpose of the statute is two-fold: to allow disabled individuals to shelter (for Medicaid purposes) resources that will be used to improve their lives, while at the same time ensuring that a state providing such Medicaid benefits will be repaid, eventually, for the amounts spent on the trust beneficiary's medical care. In order to fulfill these twin objectives, argue Defendants, the state must have the ability to monitor the trust to ensure that it is being administered to benefit only the trust beneficiary. Otherwise, a beneficiary's family will be able to gain financial benefit from the trust while at the same time

avoiding the responsibility of paying for the beneficiary's medical care.  Defendants maintain that one consequence of such expenditures will be the unwarranted depletion of trust assets that could and should be used to reimburse the state for its Medicaid expenditures on behalf of the trust beneficiary.

The resolution of the argument depends upon the intent of the legislation.  It is elementary that the first source the Court must turn to in determining that intent is the plain language of the statute.  *Been v. O.K. Industries, Inc.*, 495 F.3d 1217, 1227 (10th Cir. 2007).  The Court's primary goal in construing the statute must be to discern and apply the Congressional intent behind the enactment of the provision.  *Id.*  Plaintiff contends the language of the statute is clear – it says only that a trust must be established for the benefit of the disabled individual, not that it must be established and administered for that individual's benefit.  Plaintiff thus interprets the statutory term "established" to be limited to the initial formation or creation of the trust, and construes the reach of the statute's "benefit of" provision to an examination of the benefit to the trust beneficiary only at the inception of the trust.  Therefore, argues Plaintiff in essence, the statute by its terms does not allow any continued monitoring of the trust to ensure benefit only to the beneficiary after the trust document has been drafted and executed.  Plaintiff contends that after the inception of the trust, the state must simply rely on the trustee to approve expenditures for the benefit of the disabled individual.

The language employed in the statute, however, is not as clear as Plaintiff would have it.  It is by no means apparent that by using the term "established" Congress intended to limit consideration of the "benefit" requirement to the initial creation of the trust.  This can be seen merely by reviewing dictionary definitions of the word "establish."  *See Anderson v. UNUM*

10

*Provident Corp.*, 369 F.3d 1257, 1264 (11th Cir. 2004) (courts often turn to dictionary definitions for guidance in construing statutory terms).  According to *Black's Law Dictionary*, the term means "[t]o settle, make, or fix firmly; to enact permanently..."  (8th ed. 2004).  The *Webster's* definition is similar: "[t]o found, institute, build, or bring into being on a firm or stable basis..." *Webster's Unabridged Dictionary* (2d ed. 2001).  These definitions go beyond the initial creation of an entity or institution, and implicate continued, lasting existence and stable functionality of that entity or institution.  This can be seen from one of the examples used in *Webster's* to illustrate the definition of "establish":  to establish a medical practice.  It is possible that such a reference might be limited to preparatory steps such as obtaining a medical license, renting office space, and somehow making it known that medical treatment can be obtained at that location.  The more common understanding of this phrase, however, is that the practice has become stable over time, by acquiring a number of patients and becoming an "established" operation.  *See also Anderson, supra*, 369 F.3d at 1264 (construing statutory term "establishing" in ERISA context; noting that the definitions of "establishing" and "maintaining" overlap; noting that because the term "establish" suggests making a benefit plan stable and firm, the employer would have to go beyond merely setting up the plan in order to be considered to have established it).  Standing alone, therefore, the language of § 1396p(d)(4)(A) does not reveal whether Congress intended to preclude states from inquiring into the manner in which a special-needs trust is administered, and the Court must look elsewhere in its effort to discern Congressional intent.

Another avenue often pursued in performing statutory construction is an examination of the legislative history of the provision in question.  *See, e.g., State of Utah v. Babbitt*, 53 F.3d 1145, 1148 (10th Cir. 1995) (Congressional intent may be ascertained through legislative history,

if statutory language is insufficient).  Unfortunately, in this case the legislative-history inquiry is of little assistance.  One court, discussing a different aspect of the provision, has stated there is "sparse" legislative history for § 1396p(d)(4)(A).  *In re Kennedy*, 779 N.Y.S.2d 346, 348 (N.Y. Sur. 2004).  This appears to be an understatement.  The parties submitted no legislative history for the Court's consideration, and the Court's own best efforts have uncovered no sign that Congress ever mentioned this provision in any published report.[7]  The Court therefore can find no guidance from this source of statutory construction.

The Medicaid statute is complex, and the day-to-day application of the statute has been largely left to administrative agencies.  Where that is the case, a court construing a statute will often look to the manner in which the administrative agencies have interpreted that statute, giving deference to the construction placed on the statute by presumed experts in the field.  *See, e.g., Morenz v. Wilson-Coker*, 415 F.3d 230, 235 (2d Cir. 2005) (interpretations of complex Medicaid

---

[7]One commentator provides a possible explanation for this.  Joseph A. Rosenberg, *Supplemental Needs Trusts for People with Disabilities:  the Development of a Private Trust in the Public Interest*, 10 B.U. Publ. Int. L.J. 91 (2000).  Relating events as if they are fact, with few citations to sources, Mr. Rosenberg explains that § 1396p(d)(4)(A) arose out of the federal budget reconciliation process in 1993, a process that resulted in massive legislation entitled the "Omnibus Budget Reconciliation Act of 1993" ("OBRA '93").  *Id.* p. 127.  During this process, according to Mr. Rosenberg, it became clear to disability advocates that Congress intended to restrict the use of trusts by affluent people to shelter assets and yet remain eligible for Medicaid payment of their nursing-home bills.  To preserve the special-needs-trust protections that prior state laws had established for disabled people, representatives of several advocacy groups engaged in discussions with staff members for Congressman Waxman.  According to Mr. Rosenberg, Medicaid amendments are "always among the final parts to be added to the huge budget reconciliation acts."  *Id.* p. 128.  That is assertedly what happened here; after much discussion between congressional staffers and advocates for disabled people, § 1396p(d)(4)(A) was added to the Medicaid amendments near the end of the process, which explains why no version of this provision appeared in prior proposed amendments.  *Id.*  pp. 128-130.  If Mr. Rosenberg's version of events is correct, this also explains why there appears to be no legislative history for the provision.

statute by federal agency charged with administering the statute are given "respectful consideration" at the least, and are often accorded a "significant measure of deference"). As was the case with the legislative history, however, this means of statutory construction is of little use with respect to § 1396p(d)(4)(A).

The federal agency in charge of interpreting and applying the Medicaid statute is currently called the Centers for Medicare & Medicaid Services ("CMS"). *See id.* The CMS, formerly known as the Health Care Financing Administration ("HCFA"), has said little about the states' authority to monitor special-needs trusts after the trusts have been created. What the CMS has said appears to be conflicting and open to widely divergent interpretations. For example, in the fall of 1994, the Office of the Inspector General of the Department of Health & Human Services issued an audit report entitled "The Use of Trusts by Medicaid and Supplemental Security Income Recipients Receiving Third Party Liability Settlements and Awards." June Gibbs Brown, Inspector General, Dep't of Health and Human Servs., October 1994, available at www.oig.hhs.gov/oas/reports/region/9/99300033.pdf ("Report"). In this report, the Inspector General opined that under OBRA '93, "Medicaid has no statutory right to approve trust expenditures." Report, p. 14. The report adds that trust funds could be depleted by being spent on luxury homes and vacations, or by "paying guardians large sums for caring for the disabled individuals." *Id.* In a response to the report, attached as an appendix, HCFA appears to agree with this conclusion, stating that the most prominent loophole in OBRA '93 "results from the fact that there are no limits on how trust funds can be used." Report, Appx. p. 7. This interpretation, of course, is directly in line with the manner in which Plaintiff interprets the relevant OBRA '93 provision.

Subsequently, and perhaps in response to the Inspector General's report, HCFA appears to have changed its interpretation of the statute.  In 1996 Sally Richardson, then-director of the Medicaid Bureau of HCFA, wrote a memorandum to all state Medicaid directors ("Richardson Memorandum").  This memorandum apparently stated that "...the state can monitor distributions from the trust to be sure that, in the case of the (d)(4)(A) trust, funds in the trust are used for the benefit of the disabled individual..."[8]  This direction to the state Medicaid directors is in direct opposition to the conclusion HCFA appeared to have drawn earlier, in responding to the Inspector General's report.

As for guidance in regulations and other materials promulgated by CMS or other agencies, they too are of little help.  These materials, which are few in number, simply quote the statutory provision, or make cryptic statements such as defining "For the Sole Benefit of" to mean that no individual or entity other than the disabled individual can benefit from the assets transferred to the trust, "whether at the time of the transfer or at any time in the future." [*See, e.g.,* Pltf. 1st MSJ, Exh. 6, excerpt from Dep't of Health & Human Servs. State Medicaid Manual, or SMM; *id.,*

---

[8]The Court uses the term "apparently" deliberately, because the Court has been unable to locate a direct source for this Richardson Memorandum.  However, the Court has found the same sentence of the report quoted in two different sources.  These sources, typos aside, quote the exact same language as that set out above.  *See* Barrett, Cynthia L., *Estate Planning In Depth, Elder Law Issues 2002* § 2.A.2, fn. 12, ALI-ABA 2002 (available for a fee from ALI-ABA website); Sangerman, Jay J., "Medicaid Liens and Recoveries.  Do Liens Need to Be Settled Prior to the Establishment of the Supplemental Needs (sic)", no numbered pages, quoted near end. available at www.sangerman.com/html/medicaid_liens__recoveries_and.html.  Furthermore, at least one other court has noted the existence of the Richardson Memorandum, and described it as being sent to all state Medicaid directors to explain the rules governing trusts and Medicaid following OBRA '93.  *Robert v. Department of Health and Human Services*, 2005 WL 1861755 (E.D.N.Y. 2005) (unpublished).  The Court therefore accepts the quotes recited above as accurate depictions of the statement in the Richardson Memorandum.  However, the Court notes the decision in this case would not change if the Richardson Memorandum contained no such language.

Exhs. 3-5, excerpts from Social Security Administration Program Operations Manual System, or

POMS]  None are directly on point and none shed any direct light on the issue of statutory

construction at hand, and the Court therefore considers them to have no persuasive value.[9]  For all

of these reasons, the Court finds little guidance from CMS concerning the proper construction of §

1396p(d)(4)(A).  Therefore, the Court must look to other possible sources for assistance in

construing the provision.[10]

Several practitioners in the field of elder law have written articles concerning the general

topic of special-needs trusts, and have produced somewhat ambiguous statements concerning the

specific issue of a state's control over administration of such trusts.  Elaine J. Schwartz

recognized that "[a]n argument can be made that the only requirement is to transfer the assets to

_____

[9]Normally, a court would be inclined to grant at least some deference to statements made in the SMM and the Social Security Administrations' POMS.  *See, e.g., Stroup v. Barnhart,* 327 F.3d 1258, 1262 (11th Cir. 2003) (POMS does not have the force of law, but can be persuasive); *Ramey v. Reinertson*, 268 F.3d 955, 963 (10th Cir. 2001) (SMM does not have force and effect of law, but is entitled to some deference).  In this case, however, the statements are so obviously off-point and directed at other concerns as to be essentially without value with respect to the question facing the Court in this case.

[10]The Court notes that it does not give deference to the interpretation Defendants, as well as the ALJ presiding over Plaintiff's administrative appeal, have placed on § 1396p(d)(4)(A). This is because of the general rule that a construction of a federal statute by a state agency is not given the same type of deference as that accorded a federal agency's interpretation of the statute it is charged with administering.  *See Three Lower Counties Community Health Servs., Inc. v. Maryland*, 498 F.3d 294, 302  n. 2 (4th Cir. 2007); *cf. Kegel v. State*, 830 P.2d 563, 566 (N.M. App. 1992) (while some legal authority supported state agency's interpretation of Medicaid statute, better reasoning was to the contrary).  This general rule is especially applicable where, as here, there is no evidence a federal agency has adopted or approved of the state agency's interpretation.  *Three Lower Counties.*  The only evidence Defendants have offered concerning such federal approval is hearsay testimony from Defendant Zenderman concerning telephone conversations she allegedly had with Gary Martin, a CMS employee and supposed expert in the field of special-needs trusts.  As noted in one of the motions in limine, that testimony is inadmissible and cannot be considered for summary-judgment purposes.

such a trust, but that there is no standard for how that trust is administered after the transfer."

Elaine J. Schwartz, *Preserving Family Assets When Qualifying for Medicaid*, 16687 NBI-CLE

204, p. 218 (2004).  However, she then goes on to counsel that in authorizing payment from the

trust while maintaining eligibility for Medicaid, one must "[e]valuate to what extent payments can

be made for the benefit of others.  For example, payments of real estate taxes for the home will

benefit other household members as well." *Id.*  at 219.  Patricia Tobin has also recognized that

"[i]f the family or the beneficiary refuses to accept the reporting requirements of the public

benefits program or insists on accepting funds from the trust or from other sources that violate

public benefits rules, it is unlikely that the special needs trust will meet its goal of maintaining the

beneficiary's eligibility for public benefits."  Patricia Tobin, *20/20 Foresight:  Planning Ahead for

Special Needs Trusts*, 11-Jun Prob. & Prop. 56, 60 (1997).  As neither of these practitioners cites

any authority for their opinions, which is also the case for every other article the Court has

located, the Court finds the opinions of practitioners to be of little help in this case.

Having exhausted other means of discerning legislative intent, the Court turns to the only

avenue left – examining the context in which the provision was enacted, and the overall scheme of

the statute of which it is a part.  *See, e.g., Been v. O.K. Industries, supra*, 495 F.3d at 1227 (court

construing a statute should read the words of the statute in context, as a part of the overall

statutory scheme).  As has been stated, the special-needs trust provision at issue was a small part

of a larger effort by Congress, to severely restrict the use of trusts by potential Medicaid

beneficiaries.  *See, e.g., Ramey, supra*, 268 F.3d at 961.  Congress had the perception that wealthy

people who could afford to pay for their own medical care had been sheltering income in trusts, in

order to qualify for the government-funded Medicaid program.  *Id.*; *see also* Jennifer Field,

*Special Needs Trusts:  Providing for Disabled Children Without Sacrificing Public Benefits*, 24

J.Juv.L. 79, 86 (2003-2004) ("In the OBRA '93 legislation, Congress characterized trusts as 'the

single most offensive Medicaid estate planning vehicle' and attempted to curtail their use.");

Rosenberg, *supra* n. 7.  The Medicaid program, however, is a program with limited resources,

intended as a benefit only for those who cannot afford to pay for their own necessary health care.

*See, e.g., Hern v. Beye*, 57 F.3d 906, 911 (10th Cir. 1995).  By limiting the use of such trusts,

Congress was acting to ensure that Medicaid funds would be used for the truly needy. In doing so,

Congress protected the interests of disabled individuals by enacting the limited exception found in

the special-needs-trust provision.[11]

 The bottom-line question for the Court is this:  would Congress have intended to allow a

special-needs trust to be depleted, for the benefit of the disabled individual's family rather than

the individual himself, and yet still require the state to pay for the disabled individual's medical

care through the Medicaid program?  To pose the question is to answer it; of course Congress

would not want this to occur.  Under Plaintiff's interpretation of the statute, however, a state

would have no choice but to sit back and watch the assets of the trust be used for the benefit of

individuals other than the beneficiary, reducing the state's remainder interest in those assets, all

---

 [11]In doing so, Congress did not act in a complete vacuum.  Although special-needs trusts
did not appear in the federal statutory framework before OBRA '93, several states had already
enacted statutes concerning such trusts and how they should be administered with respect to
Medicaid eligibility.  At least one of these statutes, in New York, explicitly recognized the state's
remainder interest in a special-needs trust,  and sought to protect that remainder interest "by
authorizing the promulgation of regulations to assure the fulfillment of the trustee's fiduciary
obligations" toward that remainder interest.  *Petition of Goldblatt*, 618 N.Y.S.2d 959, 960 (N.Y.
Sur. 1994).  Without any evidence that Congress was even aware of this statute, or the question
of a state's remainder interest in a trust, at the time OBRA '93 was enacted, the significance of
these state statutes remains murky.

while continuing to provide medical care to the beneficiary at government expense.[12]  This cannot have been the intent of Congress.

Furthermore, this is not the practice of the various states that have explicitly recognized special-needs trusts by statute or regulation.  For example, in an article for a Massachusetts Continuing Legal Education publication, *Drafting Irrevocable Trusts in Massachusetts*, the authors discuss the benefits of a special needs trust pursuant to § 1396p(d)(4)(A), but note:  "[t]he only drawback to this trust is that upon the beneficiary's death the state must be reimbursed for any funds it had expended on his or her behalf. In addition, the states have the right to monitor trust distributions to be sure the funds are used for the benefit of the disabled beneficiary. For example, with respect to applications for MassHealth, the Office of Medicaid requires that the trust permit it to demand an annual account of the trust's expenditures. Typically, these accounts are not requested every year, but in any given year the trustee must be prepared to submit one."  Alyssa Adams and Harry S. Margolis, *Irrevocable Supplemental Needs Trusts*, DITM MA-CLE 7-1, § 7.4hh.2 (2005).  The Court has already pointed out New York's statute explicitly requiring protection of the state's remainder interest in a special needs trust, *see* n. 11, *supra*, and notes there are other state statutes recognizing states' authority to monitor special-needs-trust expenditures.  *See, e.g.,* C.R.S.A. § 25.5-6-103(1)(b) (Colorado statute requiring state agency to promulgate rules concerning reimbursement of departments of social services for efforts undertaken "for the recovery of trust property that has been improperly distributed or otherwise

_____

[12]The Court recognizes Plaintiff's argument that the trustee is required to act in the best interests of the beneficiary.  However, if trustees were always as trustworthy as they are supposed to be, the texts on trust law would be exiguous.  Furthermore, a trustee is required to act in the best interest of the beneficiary; as discussed below, this is a different standard than a standard requiring the trustee to act for the sole benefit of the beneficiary.

18

expended."). While the states' practice is not controlling, it comports with the common-sense interpretation of § 1396p(d)(4)(A) that the Court adopts today and is therefore supportive of that interpretation.

Plaintiff makes two other arguments with respect to this issue that are in the nature of purely legal questions rather than fact-bound issues. First, Plaintiff points out there are no federal or state regulations concerning the state's authority to monitor special-needs trusts, and to terminate Medicaid benefits if the trusts are not being administered for the sole benefit of the disabled beneficiary. Absent such regulations, argues Plaintiff, Defendants' decision was a purely arbitrary ad hoc decision that cannot stand. However, an agency is not required, prior to taking enforcement action, to promulgate a regulation concerning every possible legal or factual issue that might arise out of a particular statute. *See Pulido v. Heckler*, 758 F.2d 503, 506 (10th Cir. 1985) ("[A]s a general rule, an administrative agency is not required to promulgate detailed rules interpreting every statutory provision that may be relevant to its actions."); *cf. Gould v. Shalala*, 30 F.3d 714, 720 n. 7 (6th Cir. 1994) (fact that no regulations have been promulgated on the subject does not affect court's obligation to defer to the agency's reasonable interpretation of the statute). Instead, an agency has broad discretion to proceed on the basis of case-by-case adjudication, as it did here, rather than attempting to make a generally-applicable rule. *N.L.R.B. v. Bell Aerospace Co. Div. of Textron, Inc.*, 416 U.S. 267, 294 (1974). Thus, the absence of any regulations authorizing Defendants to examine the use of the trust assets does not vitiate their authority to take such action. Instead, they had the option to proceed through the adjudicative process by taking action to terminate Plaintiff's Medicaid benefits and litigating the administrative proceedings which ensued.

19

Plaintiff also argues that as a matter of law, his Medicaid benefits cannot be terminated because Defendants cannot impose more strict requirements upon his Medicaid eligibility than could be imposed under the SSI program.  His argument is as follows:  (1) before his father became employed again, he was eligible for SSI benefits; (2) he was notified those benefits would be terminated, and his attorney at the time, Ms. Sale, appealed the proposed termination; (3) the proposed basis for termination was that his resources exceeded the allowable limit, because his special-needs trust did not qualify for exclusion; (4) subsequently, the Social Security Administration ("SSA") decided the trust did qualify for exclusion, but Plaintiff was still ineligible for SSI benefits because his father was now working and earning too much money; and (5) since SSI decided the trust should be excluded as a resource, Defendants are bound by that determination.  It is true that states may not "employ a methodology" that would render a person ineligible for Medicaid if that individual would be eligible for SSI.  *See, e.g., Brown v. Day*, 434 F.Supp.2d 1035, 1037 (D. Kan. 2006).  However, the Court disagrees with Plaintiff's argument, for at least three reasons.

First, Plaintiff has provided no admissible evidence that SSA actually made a determination that his trust should not be counted as a resource.  Instead, Plaintiff submitted only Ms. Sale's hearsay testimony concerning the rationale for SSA's decision.[13]  That hearsay

---

[13]Plaintiff argues this testimony was not hearsay, because Ms. Sale had "personal knowledge" of the SSI appeal and SSA's decision.  "Personal knowledge," however, does not overcome a hearsay problem.  A person who has a conversation with a third party has personal knowledge of that conversation, but the substance of what the third party said is still hearsay.  Similarly, here Ms. Sale testified in essence that SSA told her, on paper or orally, the reasons for the decision; that testimony is inadmissible hearsay.  *Aronson v. Peoples Natural Gas Co.*, 180 F.3d 558, 563 n.2 (3d Cir. 1999) (district court properly refused to consider party's statements, despite argument that he had personal knowledge of certain facts as a result of conversations with various individuals).

testimony cannot establish whether SSA did or did not decide the trust was excludable as a resource.

Second, there is no evidence indicating SSA based its decision on the same facts as those relied on by Defendants.  To successfully argue that SSA's decision controls the Medicaid eligibility decision as well, Plaintiff needed to show that SSA knew the same facts regarding the administration of the trust, such as the salary paid to Plaintiff's mother for caretaking duties, and still decided the trust should be excluded.  Absent such a showing, Plaintiff cannot establish that Defendants applied a stricter eligibility test to Plaintiff's trust than did SSA.

Finally, the Court must point out that if SSA decided that a state as a matter of law has no authority to monitor expenditures from a special-needs trust, that decision was wrong.  If SSA makes an erroneous decision, a state cannot be bound by that decision in reaching a Medicaid eligibility determination.

In conclusion, the Court holds that Congress intended to allow states to monitor special-needs trusts to ensure they continue to be administered for the sole benefit of the disabled beneficiary.  If trust assets are used to directly benefit other individuals, such as members of the beneficiary's family, the state has the authority to terminate the beneficiary's Medicaid eligibility and require the family to pay the beneficiary's medical expenses.

**State's Authority to Prohibit Payment to Mother for Caretaking Duties**

The basis for the administrative decision in this case, upholding the termination of Plaintiff's Medicaid benefits, was narrow.  The ALJ addressed only the salary paid to Plaintiff's mother, and limited the holding to payment for caretaking duties.  The ALJ specifically did not decide whether the trust could pay Plaintiff's mother for specialized medical care such as physical

therapy, and concluded there was no need to address other potential problems with the trust

expenditures, such as payment of a "substantial portion" of the cost of the family home.  Thus, the

ALJ did not decide as a matter of law that payments to a family member could never be for the

sole benefit of a trust beneficiary.  To the extent the ALJ's decision makes a factual determination

that the activities of Plaintiff's mother constitute caretaking rather than specialized medical care,

as discussed above that decision is binding under the doctrine of collateral estoppel.[14]  Plaintiff

does make one argument, however, that might be considered a purely legal issue.  Plaintiff

contends that Defendants would consider payment to a third party, to perform the same caretaking

duties as those performed by Plaintiff's mother, to be for the sole benefit of Plaintiff.  Therefore,

argues Plaintiff, it is arbitrary and capricious to hold that payment of a salary to Plaintiff's mother,

to perform those same duties, is not for Plaintiff's sole benefit.

It may be that resolution of this issue in this particular case is a mixed question of fact and

law, and the Court should refrain from addressing it (thus allowing the question to be decided in

the administrative appeal).  However, in the interest of judicial economy, the Court will address

the argument.  It is clear that depending on the circumstances it is not automatically arbitrary and

capricious to treat payments to a family member differently than payments to an outside third

party.  It is true that having Plaintiff's mother, rather than a third party, act as his caretaker may

well be in his best interest.  It is also true, as Plaintiff argues, that payments to a third party from a

trust benefit the third party as well as the beneficiary, and therefore cannot logically be said to be

---

[14]There is no dispute that Plaintiff requires much more constant and intensive caretaking
than would a non-disabled young teen-age boy.  However, the fact that the caretaking takes more
time and energy than should have to be devoted to an individual Plaintiff's age does not convert
the caretaking into specialized medical care.

for the "sole" benefit of the beneficiary.  There is an important difference, however, between third parties and family members, where a special-needs trust is concerned.  A third party has no moral or legal responsibility to pay for the trust beneficiary's medical expenses and is not receiving a benefit from the state while at the same time receiving a salary from the trust.  The parents of a disabled teenager, on the other hand, certainly have such a duty, at least in comparison with the government, and receive a substantial benefit from the state if their child remains on Medicaid. *See Schweiker v. Gray Panthers*, 453 U.S. 34, 45 (1981) (quoting a Senate Report which states that it is proper to expect parents to be held accountable for the support of their minor children); *cf.* Thomas D. Begley and Andrew H. Hook, *Special Needs Trust Administration:  Special Assets*, 35 Est. Plan. 44 (2008) ("...[A] special needs trust cannot be used to pay a legal obligation of support for the parent.  Parents have a duty to provide shelter for their minor children...").

The whole purpose of a special-needs trust is to shelter resources so that the state, through Medicaid, pays for medical expenses rather than having the beneficiary's family pay for them.  In exchange for the removal of that potentially ruinous responsibility, a family must choose to refrain from directly benefitting from the resources of a special-needs trust.  Otherwise, the state is put in the position of having its remainder interest in the trust dwindle, while the trust's resources are being used to benefit not only the Medicaid beneficiary but the family whose legal and moral responsibility has been assumed by the state.  In other words, the standard that must be applied to expenditures from a special-needs trust is not whether those expenditures are in the best interest of the beneficiary.  Instead, given the important remainder interest granted to the state by the statute, those expenditures must be limited to solely benefitting the beneficiary, to balance the interests contemplated by § 1396p(d)(4)(A).

In sum, payment of a salary to Plaintiff's mother for caretaker services, while certainly in Plaintiff's best interests, is not for his sole benefit as contemplated by § 1396p(d)(4)(A).[15]  It provides too much direct financial benefit to Plaintiff's family, the entity that is liable for Plaintiff's medical expenses if his trust is not excluded as a resource.  Put another way, the state is not required to both provide Medicaid services to Plaintiff, and also allow Plaintiff's family to benefit directly from the trust that is supposed to reimburse the state for the Medicaid services it has provided during the existence of the trust.  If Plaintiff's family chooses to benefit directly from the trust resources by having the trust pay a salary to Plaintiff's mother, the state is entitled to require the family to forego Medicaid benefits for Plaintiff.

### Effect of These Holdings on Other Issues and Motions

**Qualified Immunity:**  The Court recognizes this decision navigates uncharted waters. Given the possibility the Tenth Circuit may resolve the eligibility issue differently, the Court will briefly address the question of qualified immunity.  As should be readily apparent from the foregoing, there was no clearly established law anywhere concerning a state's authority to monitor expenditures from a special-needs trust in order to ensure those expenditures were for the benefit of the beneficiary and not someone else.  Therefore, even if it is determined this Court has erred on the merits and a constitutional or statutory violation did occur, the individual Defendants are still entitled to qualified immunity.  *Eidson v. Owens*, 515 F.3d 1139, 1145 (10th Cir. 2008)

---

[15]The Court is constrained to add that, like Defendants, the Court has serious concerns about the use of trust resources to pay for other items, such as the payment of a "substantial portion" of the cost of the home the family lives in, apparently without paying any rent to the trust.  *See* Begley, *supra* (if a special needs trust owns a home that is occupied by other family members, they must pay their pro rata share of the expenses of operating the home).  However, since the ALJ did not address this issue and the facts are not before the Court, there is no need to decide it at this time.

(qualified immunity protects government officials from liability for damages insofar as their conduct does not violate clearly established statutory or constitutional rights); *Anderson v. Blake*, 469 F.3d 910, 914(10th Cir.2006) (party must show a right is clearly established with cases from the Supreme Court, the Tenth Circuit, or the weight of authority from other circuits).  As the Court's discussion of the language and intent of the statutory provision proves, Plaintiff's argument that the statute is so straightforward that it alone provides clearly-established law is unavailing.  The individual Defendants are therefore entitled to qualified immunity from any claims for monetary damages.

**Constitutional Claims:**  Plaintiff's constitutional claims must fail because they are premised on the assertion, decided against Plaintiff in this opinion, that Defendants erroneously terminated Plaintiff's Medicaid benefits.  The Court notes Plaintiff has attempted to raise a procedural-due-process claim arising out of Defendants' failure to notify Plaintiff of his ineligibility for "slots" in two different state-run programs for disabled individuals.  It is undisputed, however, that eligibility for those programs is dependent on eligibility for Medicaid.  Thus, resolution of Plaintiff's Medicaid claim also resolves the issue of his eligibility for these programs, rendering his notice-and-opportunity-to-be-heard claim moot because he had no property interest in the "slots" at issue.  *See, e.g., Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972) (to have a property interest in a benefit, a person must have a legitimate claim of entitlement to it); *Nichols v. Bd. of County Com'rs of County of La Plata, Colorado*, 506 F.3d 962, 969 n. 2 (10th Cir. 2007) (courts must decide whether plaintiff has protected property interest at all before addressing whether the government's decision or procedures comported with due process).  It was not necessary for Defendants to provide another opportunity for Plaintiff to

adjudicate his entitlement to Medicaid benefits, when he was already pursuing an administrative appeal, a state-court action, and then this action.

**Other Motions:**  The remaining motions filed by the parties are all moot or rendered without merit as a result of this decision.  First, Plaintiff's motion to amend to add new parties is moot because they are state employees and the decision in favor of Defendants on the merits applies to them as well as the already-named Defendants.  Plaintiff's motion for partial summary judgment as to damages is denied because no damages will be awarded.  Finally, the motion in limine filed by Defendants is moot because there will be no trial at which the evidence they seek to exclude might be introduced.

**Conclusion**

Based on the foregoing, summary judgment on the merits will be granted to Defendants and Plaintiff's claims will be dismissed.  The Court must also note dismay at the amount of trust resources that have been expended on attorney's fees.  In Plaintiff's motion for partial summary judgment concerning damages, counsel indicates the fees paid by the trust are over $68,000.  If the trust has indeed spent that much on attorney's fees, that amount appears to be far greater than the amount of medical expenses Plaintiff's family would have had to pay during that same period of time, based on the testimony the Court has heard concerning such expenditures and on the medical expenses claimed in the damages motion.  This does not appear to be a wise use of the trust's resources.

DATED this 31st day of March, 2008.

BRUCE D. BLACK
UNITED STATES DISTRICT JUDGE